DUFRESNE, Judge.
This is a tort action by Edgar Carlsen, plaintiff, for back injuries requiring surgery which he sustained when his automobile was rear ended by a Mercedes-Benz truck owned and operated by Mehaffey & Daigle, Inc. (M & D). Herbert Gatlin, the truck driver; gave the following uncontested version of the accident. He was traveling within the speed limit in the center lane of Airline Highway in Jefferson Parish, with the truck loaded. As he approached a red light he applied the brakes, but they malfunctioned. Carlsen, also in the center lane, was stopped at the light. Gatlin engaged his hand brake and tried to change lanes, but traffic prevented this maneuver. He collided with the rear of Carlsen’s car at about 8 miles per hour.
Carlsen sued M & D and their insurer, Fireman’s Fund Insurance Co., within the one year prescriptive period, alleging strict liability under La.Civ.Code art. 2317. More than one year from the date of the accident, but within the 90 days allowed for incidental demands under La.Code Civ.Pro. art. 1067, M & D brought an incidental demand for contribution and/or indemnification against New Orleans Truck Center (NOTC) and their insurer, Sentry Insurance, alleging negligence in repair and maintenance of the brakes on the truck. Some two years after the date of the accident, Carlsen amended his petition to name NOTC (by then bankrupt), and Sentry as defendants in the main action.
After presentation of the case, but before its submission to the jury, the trial judge granted a directed verdict against M & D and Fireman’s Fund on the issue of strict liability. All issues as to the negligence of Herbert Gatlin, M & D's driver, and NOTC, as well as damages, were decided by the jury. It concluded that negligent repair and maintenance of the brakes by NOTC was the proximate cause of the accident, and awarded Carlsen $222,000 in special, and $50,000 in general damages.
In his original judgment, the trial judge held M & D and Fireman’s Fund strictly liable to Carlsen under La.Civ.Code, art. 2317, and held NOTC and Sentry solidarily liable with them for negligence in improperly repairing the brakes. He further ruled that M & D and Fireman’s Fund were owed indemnity by NOTC and Sentry for the full amount of the judgment. Carlsen then moved for judgment notwithstanding the verdict seeking an increase in general damages. This motion was granted and the trial judge raised this element of damages to $150,000 for a total award of $372,-000.
Sentry urges four assignments of error, as follows:
1. The jury was manifestly wrong in finding that NOTC was negligent;
2. It was error for the trial judge to grant a directed verdict against M & D, and then deny a directed verdict in favor of NOTC exhonerating it from liability;
3. It was error for the trial judge to cast M & D and NOTC in judgment as solidary obligors, and then grant M & D indemnity from NOTC; and
4. It was error for the trial judge to raise the general damage award from $50,-000 to $150,000.
M & D has also appealed, urging that the increase in the damage award should be reversed.
The first issue raised by Sentry is a factual one, and therefore our inquiry is whether the jury’s finding of negligence on the part of NOTC was manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979).
*1189 The pertinent facts on this issue are these. Prior to its bankruptcy, NOTC was a distributor and service center for Mercedes-Benz trucks. The truck in question here was manufactured with a stripped down rear chassis and only one rear axle. When M & D was negotiating with NOTC to purchase the truck, it asked that a second rear axle be added to increase the weight capacity of the vehicle. The truck was sent by NOTC to Truck Bodies, Inc., which installed a second or “tag” axle. NOTC added the cost of this work to the purchase price, and on February 12, 1981, sold the truck to M & D. At this time, M & D was advised that in order to maintain the manufacturer’s warranty, the truck would have to be brought in for periodic maintenance according to the Mercedes-Benz schedule. M & D faithfully brought the truck in to the NOTC shop for all recommended servicing.
The accident with Carlsen occurred on September 14, 1982. Four months before, on May 28th, the truck was brought to NOTC for its 18,000 mile maintenance check up. The invoice for this work showed that M & D was charged for two cans of brake fluid, and Roger Benoit, a mechanic for NOTC at the time, testified that this indicated a leak in the brake system. On July 20th, Gatlin, the regular driver of the truck, brought it back to NOTC because the brakes were not working properly. The invoice for this date shows a charge for additional brake fluid, as well as a charge for a brake line, identified as part NO. 345-420-80-28. However, the narrative of work done as per that invoice, states only that the brakes were adjusted and fluid added. The following day, Gatlin noticed continuing brake problems, and again brought the truck to NOTC for service. The July 21st invoice shows that still more brake fluid was added on that day. Gatlin testified that a week to ten days before the accident he experienced further brake problems and brought the truck back to NOTC. Gatlin stated that a mechanic checked the brakes, drove the truck around the block, and told him he could take the vehicle. No corroboration of this service stop could be found in NOTC’s records, although its policy was to invoice every vehicle brought into the shop.
Immediately after the accident, Gatlin looked under the truck and saw that the hydraulic brake line to the rear axles was broken off just below the master cylinder. The truck was towed to the NOTC shop. Gatlin observed the mechanic unscrew the nut connecting the broken line to the master cylinder, and testified that the flared end of the broken line fell to the ground when the nut was taken off. Although the broken line was lost by the time of trial, there was no substantial evidence in conflict with Gatlin’s testimony that the line was completely severed below the flare at the master cylinder connection.
The attached diagram (Appendix “A”) is a schematic rendering of the truck’s braking system at the time of trial. All brake lines indicated as red were original factory equipment. It was further shown that all Mercedes-Benz replacement lines are gold or yellow, and that red lines are not sold by them as replacement parts. The two yellow lines, marked “A” and “B” were therefore not origianl equipment on the vehicle. These lines were in fact parts of a redesigned hydraulic brake system which was added to the truck when the “tag” axle was installed.
The dotted line marked “D” was also a part of this redesigned hydraulic system and was in place at the time of the accident. After the accident, this “D” line was removed, and the “tag” axle was refitted with air brakes which now operated off the air system of the brake booster rather than hydraulically, as they did when the accident occurred. Thus, at the time of the accident, when the “A” line broke at the master cylinder, the entire rear braking system failed.
We next turn to the question of why the “A” line broke. The first theory, advanced by M & D’s expert Harold Meyers, was that the “A” line had been replaced, improperly flared, and the nut overtightened by a NOTC mechanic during the July 20th, repair job. He arrived at this opinion in part because the invoice for that work showed that M & D was charged for a *1190 brake line. The part number of the line shown on the invoice is in fact for the line indicated as “C” in the schematic, which is some 80 inches long, while line “A” is only 60 inches long. Further, line “C” on the truck was a red line, showing that it was original factory equipment and had never been changed. Meyers surmised that on July 20th, the “A” line had to be changed, and because it was not a standard Mercedes-Benz part, NOTC used the replacement 80 inch line and cut and flared it to fit the 60 inch span of the “A” line. David Nash, the NOTC mechanic who serviced the truck on that day, testified to the contrary, that he was not qualified to change or flare brake lines, was under specific orders from his supervisor not to do such work, and never flared a line while employed by NOTC. The only explanation by NOTC as to the charge for the brake line on the invoice, was that it was a billing error.
The second theory, advanced by NOTC’s expert L.L. Denson, was that the line may have been struck by some road hazard. However, Roger Benoit, the NOTC mechanic who repaired the “A” line after the accident, testified that he saw no evidence of the line having been struck by any road hazard.
The third theory, also advanced by Den-son, was that improper bracketing of a brake line would cause vibrations which in turn would cause metal fatigue and eventual failure and that vibration was the probable cause of failure of this line. He also stated that a repair shop should check brake lines for vibration if the brakes were malfunctioning, and make sure that the lines are bracketed properly. Richard Anderson, a Mercedes-Benz expert on brake lines, was shown a photograph of the underside of the truck, and testified that the “A” line was not positioned as recommended in his company’s service manuals, and in his opinion it was improperly bracketed. Nash also admitted that it would have been his responsibility to check lines for vibration and proper bracketing, especially when they were not installed according to manufacturer’s specifications, and this testimony was corroborated by John Drury, Nash’s supervisor at NOTC.
On this showing, we find no manifest error in the jury’s finding that NOTC was negligent in repairing the brakes. The truck was brought to their shop three, and probably four, times between May and the time of the accident in September. On each occasion work was done on the brakes and fluid was added, thus indicating a leak in the system. NOTC’s expert, as well as two of its mechanics, admitted that it would have been the repairman’s responsibility to check for vibration and improper bracketing in such a situation. The mechanics further stated that if a line were not installed according to the manufacturers’ specifications, this would have suggested careful inspection for vibration. Anderson testified that the line was not run or bracketed according to specifications. Although Denson testified that in his opinion the line was properly bracketed, he also stated that vibration was the probable cause of the failure. The jury could reasonably have seen the contradictory nature of Denson’s statements, and accepted instead Anderson’s opinion that the bracketing was improper, and that NOTC was negligent in failing to correct this problem.
The next two errors raised by Sentry must be treated together. Sentry begins with the premise that NOTC and M & D cannot be solidarily liable to Carlsen. It next asserts that the directed verdict against M & D in strict liability exonerated it from any liability to Carlsen because this judgment could only have been proper if Carlsen failed to prove that NOTC was negligent. It concludes, therefore, that once the directed verdict against M & D was rendered, it was error for the trial judge to deny its contemporaneous motion for a directed verdict in its favor, and instead to submit the issue of NOTC’s negligence to the jury.
In the alternative, Sentry argues that if the jury verdict finding NOTC negligent is correct, then M & D must be exonerated from liability, because the entire fault in causing the injury lies with NOTC. In that circumstance, it urges that Carlsen’s claim *1191 against NOTC was prescribed because NOTC was not made a party defendant by Carlsen until over two years after the accident.
It is this court’s opinion, however, that proper analysis of the case does not require resolution of whether or not NOTC and M & D are solidary obligors on the facts of this case. It is rather whether indemnification was properly awarded to M & D.
In Dusenbery v. McMoRan Exploration Co., 458 So.2d 102 (La.1984), the court addressed the question of indemnification to a strictly liable party by a negligent party as follows:
The indemnification claim is based not on the relationship between the owner of the structure and the injured party, but upon the relationship between the owner and the party who actually created the dangerous condition in the structure. When liability to the injured party is imposed on one party on the basis of strict liability only and on a second party on the basis of negligence or actual fault, the strict liability defendant may recover full indemnity by incidental demand against the party actually at fault, (at 105)
We have determined above that the jury was not manifestly erroneous in finding that the negligence of NOTC was the proximate cause of the accident. M & D timely brought an incidental demand against NOTC as permitted by La.Code of Civ.Pro., art. 1067. Under the rule of Dusenbery, supra, M & D should be indemnified by NOTC, and we hold that the award for indemnification was therefore proper.
The final issue is whether the trial court properly entered a judgment notwithstanding the verdict, increasing the jury’s general damage award from $50,000 to $150,000. Recent jurisprudence has held that the proper standard of review of judgments notwithstanding the verdict under La.Code Civ.Pro., art. 1811, is whether the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict on the facts at issue, Bick-ham v. Goings, 460 So.2d 646 (La.App. 1st Cir.1984), and cases cited therein.
We first note that the issue of causation of Carlsen’s disc problems was resolved in his favor by the jury; had they determined otherwise, they would have made no award for special or general damages. Nonetheless, we have reviewed the record carefully on this point and find no manifest error in the conclusion that the accident of September 14, 1982, was the causative factor of Carlsen’s injuries, which were as follows.
Two days after the accident, Carlsen saw Dr. Russell Levy, an orthopedic surgeon, with complaints of neck and low back pain. Over the course of the next twelve months, Dr. Levy treated him conservatively with medication and physical therapy. During this year, Carlsen suffered pain of varying degrees. When no resolution of the problem occurred, Levy ordered a myelogram in August 1983, which revealed a ruptured disc at the L-4 level. Carlsen then consulted other physicians, and in February 1984, saw Dr. Carlos Pisarello, a neurological surgeon. This doctor initially prescribed a back brace and medication, but by April 1984 determined that surgery to remove the disc and fusion of the spine were recommended.
This surgery was done on May 4, 1984, by Drs. Pisarello and James Kerr, an orthopedist. Dr. Kerr explained that a fusion is done by taking bone from other parts of the spine and placing it around the joint from which the disc was removed. Once the bone solidifies, it prevents that joint from moving and further impinging on the nerves. He further explained that for the fusion to harden properly, a brace must be worn at all times except when lying down, for about a year.
Dr. Pisarello stated that Carlsen remained in the hospital for three weeks after surgery, and had an unusually uncomfortable post-operative experience. Carl-sen recounted that for 21 days he had to lie flat in bed and could not even sit up. He was then placed on a mechanical stretcher which gradually tilted him into an upright position to acclimatize him again to stand *1192 ing. On the first attempt, he passed out, but over the course of three days, this procedure was accomplished, and he was sent home. For the next six months, he had to wear a brace every time he sat up or got out of bed. To put on the brace, he would place it next to himself on the bed, roll over into it, and fasten it completely. He in fact had two braces, one for the shower and one for ordinary wear. He stated that his daily routine was to put on the shower brace, get up and shower, return to bed and exchange the braces before getting up again. If he had to use the toilet at night, he would also have to don a brace before getting out of bed. After six months, he was allowed to take off the brace for two to three hours a day while out of bed. Finally, in February, 1985, some ten months after surgery, he was allowed to stop using the brace.
Dr. Pisarello further testified that although the surgery was successful, Carl-sen will be permanently restricted in his activities and must avoid any strenuous work or climbing.
In addition to the back surgery, Carlsen also had an adverse reaction to certain medications that were prescribed during his recovery. These drugs caused one of his breast to become enlarged, and he also had to have surgery to remove this excess tissue.
Because of these medical problems, which caused him to eventually lose his job in the maritime field, Carlsen also experienced emotional and psychological problems. Dr. Pisarello reported that Carlsen had become depressed during his convalescence, and in February 1985, he referred him to a psychiatrist, who in turn sent him to Ms. Alma Flick, an expert social worker and marriage counselor. Her testimony was to the effect that Carlsen had been a healthy, active man who was a good provider for his family before the accident. As his physical condition worsened and he lost his job, he became dispondent and withdrawn and completely lost his self image. This in turn led to sexual impotence and a general decay in his relationships with his wife, stepchild and child. These problems were corroborated by his wife, who further testified that he could no longer go bowling, or do gardening, house maintenance work, and automobile repair; all of which he had enjoyed in the past.
Given the nature of the physical injuries and the protracted period of recuperation from surgery and the need for the brace and all the discomfort that it entailed, the second breast surgery and the unrefuted family and psychological problems that the plaintiff suffered, we can only conclude, as did the trial judge, that reasonable men could not have arrived at a verdict of only $50,000 in general damages. We hold, therefore, that the judgment notwithstanding the verdict was properly entered by the trial judge.
Having so held, the next inquiry is whether the trial judge abused his much discretion in fixing the general damage award at $150,000, making a total award of $372,000. In reaching this figure, the court noted that the evidence of the case clearly warranted an award of more than $50,000 for general damages. After so concluding, he then turned to a review of other awards in similar cases for guidance in fixing the present award. Relying on Riley v. Winn Dixie of Louisiana Inc., 489 So.2d 931 (La.App. 5th Cir.1986), and cases cited therein, where a general damage award of $100,000 was fixed by the appeals court for a laminectomy, and noting that Carlsen also had a fusion as well as breast surgery, he awarded $150,000. We have reviewed this award under the standards set forth in Reck v. Stevens, 373 So.2d 498 (La.1979), and find no articulable reasons to conclude that this award was an abuse of the trial court’s discretion.
For the foregoing reasons, the judgment of the trial court awarding the plaintiff a total of $372,000 is affirmed.
AFFIRMED.
*1193 APPENDIX A
[[Image here]]