711 A.2d 177

**Michael FRANKLIN**

v.

**Glenn A. MORRISON et al.**

**No. 84, Sept. Term, 1997.**

Court of Appeals of Maryland.

June 11, 1998.

William J. Jackson (Semmes, Bowen & Semmes, on brief), Baltimore, for petitioner.

Kevin A. Dunne (Charles T. Smith, II, Stephanie A. Baldanzi, Ober Kaler, Grimes & Shriver, Baltimore; Alan D. Titus, argued (William J. Carter, Carr Goodson Lee & Warner, Washington, DC), on brief, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

This multiple party tort action arises out of a tragic automobile accident in which a mother and her two children were killed. A jury in the Circuit Court for Prince George's County awarded substantial damages. The only non-settling defen-

dant is the petitioner, Michael Franklin (Franklin), who was found to be liable. We granted his petition for certiorari in order to consider three issues which we rephrase as follows:

1. Was Franklin entitled to get to the jury on his cross-claim for indemnity against one of the settling defendants who was also found to be liable?

2. Should the jury have been advised, as requested by Franklin, of the existence and terms of the joint release purchased by all of the defendants other than Franklin?

3. How is the credit against the verdict to be determined under the terms of the instant joint release where the total consideration paid by the releasees is greater than the pro rata share of the only releasee that was found liable?

Because a motion for judgment at the close of all of the evidence was granted on Franklin's cross-claim for indemnity in favor of the alleged indemnitor, we describe the happening of the accident under the evidence most favorable to Franklin.

On December 24, 1992, Franklin took his 1992 Chevrolet S–10 Blazer (the Blazer) for routine servicing to a Beverly, Massachusetts Jiffy Lube owned and operated by a franchisee, Lube 495, Inc. (Jiffy Lube), one of the respondents. The servicing required a Jiffy Lube technician to remove the rear differential check plug, in order to check and, if necessary, replenish the lubricant level, and then to replace the plug. The technician either failed to replace or improperly replaced the check plug, causing the differential fluid to escape in a gradual, undetectable manner over the next several weeks. The lack of fluid to lubricate the gears and bearings within the differential eventually results in the gears and bearings melting, fusing together, and breaking off due to excessive friction and heat. This process causes a seizing of the rear differential and completely disables a vehicle from moving.

Franklin had experienced no mechanical difficulty with the Blazer since its servicing until shortly before noon on Saturday, January 16, 1993. At that time Franklin was driving on Route 50 in Prince George's County at highway speed in the middle of the three westbound lanes. He heard a gear

grinding noise emanating from the Blazer's undercarriage. The noise temporarily ceased, but then resumed, accompanied by a violent shaking of the Blazer and a burning smell. Franklin first tapped his brakes to disengage the cruise control and thereafter continued to "tap" his brakes to maintain control of the Blazer. He unsuccessfully attempted to drive the Blazer to the right hand shoulder of the highway through "light ... spotty type traffic." The Blazer decelerated rapidly and steadily until it came to a complete stop in the center lane. At trial Franklin was asked: "After you knew there was a problem, could you have gotten through traffic?" He responded: "No, I couldn't because the vehicle was quickly decelerating and as I looked to the right hand side to try and pull over there was heavy traffic in that lane."

When the vehicle had stopped, Franklin placed the gearshift in park. At his urging his wife exited from the passenger side of the Blazer. Franklin released the rear lift gate of the Blazer by way of a button located on the dashboard, locked the doors by pressing an automatic control button, exited from the driver's side of the vehicle, retrieved his dog from the back of the vehicle, leashed the dog, closed the rear lift gate, and made his way safely to the side of the road with his wife. Franklin testified that while on the side of the road he waved his arms in an effort to alert oncoming traffic to the presence of the disabled Blazer.

Darlene Morrison, the wife of respondent Glenn A. Morrison (the Plaintiff), was traveling behind Franklin in a 1990 Dodge Minivan occupied by her two minor children, Justin and Andrea. Mrs. Morrison was able to bring her vehicle to a stop immediately behind the Blazer. With her brakes depressed, she tried but was unable, due to passing traffic, to change lanes and get around the disabled Blazer.[1] A tractor trailer driven by Dale Mettenbrink and owned by National

---

[1] According to the testimony of Julie Rossi, an eyewitness for the Plaintiff, and of Franklin, the traffic was "spotty type traffic where you would have several hundred feet of no traffic at all and then groups of traffic where you would have ... a dozen cars or so."

Carriers, Inc. (collectively, National Carriers) crested an upgrade in the center lane of westbound Route 50 and plowed into the back of Darlene Morrison's minivan.[2] The tractor trailer dragged the minivan several hundred feet, causing it to burst into flames. Darlene Morrison and her two children were burned to death.

Post-accident investigation of the Blazer revealed that, although the rear differential check plug was missing, there was no damage to the hole threads, indicating that the check plug had not been dislodged on impact, but rather had not been properly replaced.

Franklin testified that, at the time of the accident, he was completely unaware of what caused the Blazer to be disabled. It had operated normally since its servicing at Jiffy Lube, and Franklin did not observe any leaking. An expert called by Franklin testified that differential fluid evaporates in a mist and does not leak visibly. Similarly, Franklin did not observe the fact that the check plug, which is located within the vehicle's undercarriage and which can only be reinstalled using a wrench, was either missing or improperly replaced.

The instant suit was brought by the Plaintiff, individually and as personal representative of the estates of his wife and children. Franklin, Jiffy Lube, and National Carriers were named as defendants. The defendants filed cross-claims against each other for indemnity and contribution.

On August 31, 1995, about one month before trial, the court and Franklin were advised that the Plaintiff had reached a settlement with Jiffy Lube and National Carriers (the settling defendants). The general terms of the then unsigned agreement were placed on the record. Under the agreement, all of the Plaintiff's claims against the settling defendants were

---

2. Franklin testified:

"I was aware that the truck was coming just prior to exiting the car. As the car was decelerating also, I was glancing in my rear view mirror to see what traffic there was behind. My last recollection before leaving the car is seeing a tractor–trailer truck just cresting the hill that was behind me."

released in consideration of a payment of $3.7 million. The "Release and Indemnity Agreement" was executed on September 25, 1995, the first day of trial. Relevant to the questions presented to this Court are the following terms of the agreement:

- In consideration of the payment of $3.7 million by the settling defendants to the Plaintiff, the latter agreed to release the former from any and all claims arising out of the January 16, 1993 automobile accident;

- The Plaintiff agreed to indemnify and hold the settling defendants harmless from "cross-claims, claims for contribution or claims for indemnity" arising from the Plaintiff's claims, including any such claims asserted against the settling defendants by Franklin;

- The settling defendants agreed to permit the Plaintiff to contact and utilize any experts that the former had retained and to cooperate with the Plaintiff in the prosecution of his claims against Franklin.

- The release also provided:

"This Release is <u>not</u> a joint tortfeasor release.

"This Release does not and shall not bar any cause of action, right, lien or claim arising from [the automobile accident] which [the Plaintiff] may now have or may in the future have against any alleged tortfeasor or any entity or person not specifically named herein or released hereby. However, in order to avoid inconvenience and expense to the settling defendants herein, [the Plaintiff] agree[s] that, in the event that settling defendants or any of them is determined by the Court or jury to be a joint tortfeasor, then in that event, this Release shall serve to reduce any recovery of [the Plaintiff] which may be had against any other alleged tortfeasors to the extent of the pro-rata share recoverable by law from settling defendants herein, or to the extent of the amount paid for this Release by settling defendants herein, whichever is greater, in accordance with the provisions of the Maryland Uniform Contribution Among Tortfeasors Act. The said reduction effected hereby

shall not be construed to affect the recovery in any suit, cause of action or claim in which the settling defendants herein, or any of them, shall not have been adjudged legally liable for contribution."

(Citation omitted).

Before trial started the Plaintiff dismissed his claims against the settling defendants.[3] National Carriers did not participate at trial. Jiffy Lube remained a cross-claim defendant to Franklin's cross-claim for indemnity and contribution. On the first day of trial Jiffy Lube amended its original cross-claim against Franklin to claim contribution only, rather than to claim both contribution and indemnity. Jiffy Lube continued to assert this amended cross-claim throughout the course of trial.

In summary, the three claims remaining at the start of trial were:

(1) The Plaintiff v. Franklin (negligence causing deaths and survival actions);

(2) Franklin v. Jiffy Lube (cross-claim for indemnity and contribution); and

(3) Jiffy Lube v. Franklin (cross-claim for contribution).

Prior to trial Franklin moved to have the existence and terms of the release disclosed to the jury, but the court denied that motion. Just after the jurors were sworn, the court instructed them that the Plaintiff was proceeding solely against Franklin, and that National Carriers was "no longer in the case."

The Plaintiff presented evidence from which the jury could find that Franklin was negligent based on either or both of two omissions: (1) in failing to move the Blazer to a safe location, and (2) in failing to warn approaching motorists of the disabled state of the Blazer. With respect to the issues on

---

**3.** Apparently as the result of additional agreements that are not relevant to the issues before us, Franklin and Jiffy Lube dismissed their cross-claims against National Carriers, and National Carriers dismissed its cross-claims against Franklin and Jiffy Lube.

this certiorari review, Franklin defended against the Plaintiff's claims by contending that he was not negligent, and, as to his cross-claim, he contended that his negligence, if any, was merely passive, and that the accident was caused by the active negligence of Jiffy Lube. At the close of the evidence, the trial court denied, *inter alia,* Franklin's motion for judgment on his cross-claim for indemnity against Jiffy Lube. The parties agree that the court also, in effect, granted Jiffy Lube's motion for judgment in its favor on Franklin's cross-claim for indemnity against it.

Special interrogatories were submitted to the jury. It found that both Franklin and Jiffy Lube were negligent and that their respective negligence proximately caused the accident. The jury further found that any negligence of National Carriers did not proximately cause the accident. Verdicts for the Plaintiff totaled $10,756,000, which the court later reduced to $6,806,000 pursuant to Maryland's statutory cap on non-economic damages. *See* Maryland Code (1974, 1995 Repl. Vol.), § 11–108 of the Courts and Judicial Proceedings Article (CJ).

By post-trial motions Franklin unsuccessfully reasserted that the evidence relevant to his claim for indemnity from Jiffy Lube raised a jury question and that the jury should have been furnished with the Release and Indemnity Agreement executed by the other parties.

Franklin also contended that, if he were not entitled to indemnity, the revised verdict of $6,806,000 should be further reduced by $3.7 million under the Maryland Uniform Contribution Among Joint Tort–Feasors Act, now codified as CJ (1997 Cum.Supp.) §§ 3–1401 through 3–1409 (UCATA). Three Million Seven Hundred Thousand Dollars was the total consideration paid to the Plaintiff under the Release and Indemnity Agreement which, in a single document, released all of the settling defendants. Franklin submitted that the amount paid exceeded a pro rata share. In answer, the Plaintiff produced copies of the settlement checks reflecting Jiffy Lube's having paid $1.3 million of the total $3.7 million.

The Plaintiff submitted that, inasmuch as the consideration paid by Jiffy Lube was less than Jiffy Lube's pro rata-share of $3,403,000, the credit against the judgment should be $3,403,-000 under UCATA. Franklin rebutted by relying on the following language of the release: "[I]n the event that settling defendants or any of them is determined . . . to be a joint tortfeasor, then . . . this Release shall serve to reduce any recovery . . . to the extent of the pro rata share . . . or to the extent of the amount paid for this Release by settling defendants herein, whichever is greater, in accordance with [UCA-TA]." The circuit court ruled that $3,403,000, and not $3.7 million, was the applicable credit. Judgment in the amount of $3,403,000 was entered against Franklin.

The Court of Special Appeals affirmed in an unreported opinion. That court concluded that Franklin's claim for indemnity was barred because Franklin was guilty of active negligence as a matter of law, that the release with the settling defendants need not have been disclosed, primarily because Jiffy Lube's continued participation in the case was required by Franklin's cross-claim against Jiffy Lube, and that the circuit court had correctly calculated the extent of the credit under UCATA and the release. For the reasons set forth below, we shall affirm.

## I

By seeking indemnity in addition to contribution, Franklin seeks to have 100% of the loss borne by Jiffy Lube, despite the jury's having found that negligence on the part of both Franklin and Jiffy Lube proximately caused the accident. Franklin's claim for indemnity is not based on any express contract between Franklin and Jiffy Lube. *Compare Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 708 A.2d 298 (1998) (indemnification allowed based on express provisions of contract between the parties). Franklin, in effect, makes three arguments, or levels of the same argument, in support of indemnity. Before identifying and discussing those arguments, it would be helpful to review indemnity that is not based on an express contract.

A

Indemnifications, other than those based on an express contract, "are commonly called quasi contractual, or arising out of a 'contract implied by law'. Indemnity between persons liable for a tort falls within this type of case." R.A. Leflar, *Contribution and Indemnity Between Tortfeasors*, 81 U. Pa. L.Rev. 130, 146 (1932) (Leflar). The basis for indemnity between tortfeasors "is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." Restatement (Second) of Torts § 886B cmt. *c* (1979) (Restatement). We shall call this form of indemnity "tort" indemnity. In Maryland and elsewhere, tort indemnity arose in an era when contribution among joint tortfeasors was not permitted. *Compare Chesapeake & Ohio Canal Co. v. County Comm'rs of Allegany County*, 57 Md. 201, 220–24 (1881) (county held liable for injuries to third party caused by unsafe public roadway on bridge over canal was entitled to indemnity from canal company that created, and should have repaired, the defective condition), *with* UCATA, first enacted by Chapter 344 of the Acts of 1941.

The Supreme Court of Alaska described the evolution of various applications of tort indemnity in *Vertecs Corp. v. Reichhold Chems., Inc.*, 661 P.2d 619 (Alaska 1983). After pointing out that the earliest applications of tort indemnity were in favor of one whose liability was exclusively vicarious, the court said:

"[T]he courts began to discover that the bar to contribution among fault-bearing tortfeasors worked injustice in certain cases. Some courts thus expanded indemnity to include cases in which the indemnitee, while to some degree personally at fault, was much less culpable than the indemnitor. Various appositive phrases arose to describe the situations in which indemnity would be allowed, including 'primary-secondary negligence,' 'misfeasance-nonfeasance,' and 'active-passive negligence.' However, most authorities agree that these phrases were merely labels given to a fact-finding

concept wherein courts allowed total loss-shifting because they felt that justice and fairness so required."

*Id.* at 621; *see also Allison v. Shell Oil Co.*, 113 Ill.2d 26, 29, 99 Ill.Dec. 115, 117, 495 N.E.2d 496, 498 (1986) ("With the growth of tort liability for negligent acts, the doctrine of implied indemnity was extended in response to the rule in *Merryweather v. Nixan* (K.B.1799), 101 Eng. Rep. 1337, 8 Term R. 186, which prohibited contribution among jointly negligent tortfeasors. . . .").

No single definition or rule of law identifies all instances in which one of two persons, who are liable in tort for the same legally cognizable harm, will be able totally to shift the loss to the other party. W.P. Keeton et al., *Prosser and Keeton on the Law of Torts* § 51, at 343–44 (5th ed. 1984) (Prosser & Keeton), describes the problem as follows:

"[I]t is extremely difficult to state any general rule or principle as to when indemnity will be allowed and when it will not. It has been said that it is permitted only where the indemnitor has owed a separate duty to the indemnitee; that it is based on a 'great difference' in the gravity of the fault of the two tortfeasors; or that it rests upon a dispro-portion or difference in character of the duties owed by the two to the injured plaintiff. Probably none of these is the complete answer, and, as is so often the case in the law of torts, no one explanation can be found which will cover all of the cases."

(Footnotes omitted). Many courts and commentators agree. *See, e.g., Vertecs Corp.*, 661 P.2d at 624 ("The attempt to manufacture standards for decision and the resulting labels of 'active-passive' or 'primary-secondary' negligence left the in-demnity jurisprudence of many states in disarray."); *Taggart v. State*, 45 Cal.App.3d 768, 770, 119 Cal.Rptr. 696, 698 (1975) (" '[F]ormalizations [such as active versus passive] have been criticized as being artificial and as lacking the objective crite-ria desirable for predictability in the law.' " (quoting *General Elec. Co. v. State of Cal. ex. rel. Dep't of Pub. Works*, 32 Cal.App.3d 918, 922, 108 Cal.Rptr. 543, 545 (1973))); *Allison,*

99 Ill.Dec. at 119, 495 N.E.2d at 500 (" 'All attempted definitions of active-passive negligence break down in application.' " (quoting N.J. Bua, *Third Party Practice in Illinois: Express and Implied Indemnity*, 25 DePaul L.Rev. 287, 314 (1976))); *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 147, 331 N.Y.S.2d 382, 386, 282 N.E.2d 288, 291 (1972) ("The 'active-passive' test to determine when indemnification will be allowed by one party held liable for negligence against another negligent party has in practice proven elusive and difficult of fair application."); Restatement § 886B cmt. *c* ("Expressions such as active and passive negligence or primary and secondary responsibility, while somewhat descriptive of certain specific instances, have not covered all of them or have proved misleading in some applications."); E.E. Davis, *Indemnity Between Negligent Tortfeasors: A Proposed Rationale*, 37 Iowa L.Rev. 517, 544 (1952) ("The truth of the matter is that no mere word formula can be a satisfactory test on which to base all decisions as to whether or not indemnity should be awarded."); W.P. Keeton, *Contribution and Indemnity Among Tortfeasors*, 27 Ins. Couns. J. 630, 632 (1960) ("My judgment is that none of the rules that have received currency as a basis for creating an obligation of indemnity as between negligent tortfeasors are reliable...."); Leflar at 155 (referring to "[t]he uncertainty and unreality of a distinction between active and passive negligence as a test of the right to indemnity").

For these reasons Restatement § 886B, dealing with indemnity between tortfeasors, simply sets forth in subsection (2) the "established applications" of the general principle of unjust enrichment set forth in subsection (1). Restatement § 886B cmt. *c*. Restatement § 886B reads as follows (with examples in the accompanying footnotes):

"(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.

"(2) Instances in which indemnity is granted under this principle include the following:

"(a) The indemnitee was liable only vicariously for the conduct of the indemnitor; [4]

"(b) The indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful; [5]

"(c) The indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied; [6]

"(d) The indemnitor supplied a defective chattel or performed defective work upon land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect; [7]

---

4. *See, e.g., Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Travelers Ins. Co.,* 233 Md. 205, 215, 196 A.2d 76, 81 (1963) ("[T]he claims against [masters] were predicated not upon their active negligence, but upon their vicarious, or imputed, liability for [servant's] negligent actions under the doctrine of *respondeat superior.* Therefore, in the event of a finding of liability on their part, they would have a right of action for indemnity against [servant] for the damages suffered by them.").

5. *See, e.g., Percy v. Clary,* 32 Md. 245, 250 (1870) (The doctrine to be deduced from the decisions reviewed is: "first, that the wrong must not be *malum in se;* and second, that the party claiming contribution must have acted without any design to violate the law, and as the agent or by the authority of him from whom he seeks to recover.").

6. *See, e.g., Philadelphia, Baltimore & Washington R.R. Co. v. Roberts,* 134 Md. 398, 106 A. 615 (1919) (where shipper, on consecutive days, prepared and requested railroad to issue bills of lading to separate consignees for the same shipment, railroad entitled to indemnity from shipper for loss incurred).

7. *See, e.g., Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 40–41, 517 A.2d 336, 348 (1986) (violations of safety measures in a building code that create an actual risk of death or bodily injury give rise to a non–delegable duty on the part of the real estate developer who is in turn entitled to "a right to indemnity from an independent contractor employed by him whose negligence actually caused the breach"); *Gardenvillage Realty Corp. v. Russo,* 34 Md.App. 25, 366 A.2d 101 (1976) (where landlord was liable to tenant for personal injury sustained when precast concrete porch collapsed, landlord was entitled to indemnity from the manufacturer-installer of the slab which did not conform to building code requirements).

"(e) The indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect; [8]

"(f) The indemnitor was under a duty to the indemnitee to protect him against the liability to the third person." [9]

Against the foregoing background, we shall consider Franklin's arguments in ascending order of generality. They are that the jury could find that:

1. Jiffy Lube created a dangerous condition of chattels so that Franklin is entitled to indemnity under the rule of Restatement § 886B(2)(e);

2. Jiffy Lube's negligence was active, while Franklin's negligence was passive; or

3. Jiffy Lube's negligence was disproportionately greater than that of Franklin.[10]

### B

In support of his first argument Franklin cites two trial court decisions from New York, *Corso v. Maroney*, 57 Misc.2d

---

8. Restatement § 886B cmt. *i* gives as an example "a case in which the indemnitor has wrongfully dug a ditch across the indemnitee's road or has left a dangerous obstruction on the sidewalk in front of the indemnitee's home and the latter has negligently failed to correct the situation."

9. *See, e.g., Chesapeake & Ohio Canal Co. v. County Comm'rs of Allegany County*, 57 Md. 201 (1881) (described in text, *supra*).

10. Jiffy Lube submits that Franklin's contention that the claim for indemnity presented a jury issue was not properly preserved for appellate review. Jiffy Lube says that Franklin did not object when the trial court advised counsel that it would determine Franklin's cross–claim for indemnity after the jury returned its verdict. The Court of Special Appeals, however, considered Franklin's arguments on the merits in an exercise of that court's discretion under Maryland Rule 8–131(a). Assuming, *arguendo*, that the issue was not preserved, Jiffy Lube does not contend that the Court of Special Appeals abused its discretion in departing from the ordinary requirement for preservation. Further, because the issue is of public importance, we exercise our independent discretion to consider it. *See State v. Bell*, 334 Md. 178, 188–91, 638 A.2d 107, 113–14 (1994).

898, 293 N.Y.S.2d 863 (Sup.Ct.1968), and *Lipsman v. Warren*, 17 Misc.2d 807, 188 N.Y.S.2d 426 (Sup.Ct.1959), *aff'd as modified*, 10 A.D.2d 868, 199 N.Y.S.2d 761 (Sup.Ct.1960). Both cases involve automobile accidents in which a claim was made against the operator of a vehicle, as defendant, by a plaintiff who was not a guest of the defendant. Both cases involve a third-party claim against a mechanic whose allegedly negligent repair of the brakes on the defendant's vehicle had proximately caused the accident. The New York courts held that if the defendant had no notice or knowledge of the defective brakes, indemnity would lie against the third-party defendant, but that, if the operator did have notice or knowledge of the defect, then both the operator and the mechanic would be actively negligent and there could be no indemnification. Inasmuch as there would be no liability of the defendant to the plaintiff, absent some negligence on the part of the defendant, these cases illustrate the view that passive negligence on the part of the defendant does not bar indemnification.[11]

In the case before us Restatement § 886B(2)(e) and the New York decisions are not relevant to the theory of liability which was presented by the Plaintiff to the jury and which presumably was the basis for finding Franklin negligent. That theory bases liability on Franklin's conduct *after* he knew of the defect in the Blazer. The Plaintiff did not contend that Franklin should have discovered the defect earlier than its manifestation some 2100 feet in advance of the place where the accident occurred. Disclaiming that the case was about rear axles and differentials, the Plaintiff submitted that the question of Franklin's negligence turned on what he had done or failed to do while the Blazer was traveling 2100 feet to the place where it stopped. The Plaintiff argued:

---

11. Franklin also cites *Carlsen v. Mehaffey & Daigle, Inc.*, 519 So.2d 1187 (La.Ct.App.), *writ denied*, 522 So.2d 1096 (La.1988), another defective brakes case. That decision is not on point. The jury found that the sole proximate cause of the accident was the negligence of the mechanic–indemnitor. *Id.* at 1188. Nevertheless, under a Louisiana statute, strict liability to the plaintiff was imposed on the indemnitee, the owner of the vehicle with the defective brakes. *Id.*

"Did he ever flash his lights to let cars that were going beside him know that he was having trouble with his car? No. Did he honk his horn to let cars know that there was something wrong with his car? No. Did he so much as even turn on a turn signal to let somebody somewhere know that he wants to get out of the lane that he's in? No. He didn't do any of that. Is that reasonable? No."

Franklin also relies on Restatement of Restitution § 93 (1937), which states a rule for indemnity substantially similar to that in § 886B(2)(e) of the Restatement (Second) of Torts. Consequently, the former is not applicable to the instant matter for the same reasons that the latter is not applicable.

## C

The instances listed in Restatement § 886B, in which indemnification is generally recognized as available, are not exclusive. Tort indemnity may properly be available under the general principle of avoiding unjust enrichment. It is difficult, however, to decide deductively from that principle the merits of Franklin's claim that his negligence should be considered passive while that of Jiffy Lube should be considered active. *See* Part I.A, *supra.* Nevertheless, guidance can be found in authorities indicating the general limit on the concept of passive negligence and in cases holding that negligence in the operation of a motor vehicle is active negligence.

Referring to the rule "that one whose negligence has consisted of mere passive neglect may have indemnity from an active wrongdoer," Prosser and Keeton state that the rule "has been applied only in situations where one tortfeasor, by active conduct, has created a danger to the plaintiff, and the other has merely failed to discover or to remedy it." Prosser & Keeton § 51, at 343. Leflar's review of the decisions led him to conclude that in cases allowing indemnity on the active-passive distinction in which the active negligence came first and the passive negligence later, the passive negligence "[took] the form of failure to discover and remedy the dangerous situation created by the active negligence." Leflar at 155.

Similarly, Leflar concluded that "other possible instances of joint passive and active negligence, such as cases of concurrent rather than successive negligence, or of failure to remedy an already discovered dangerous condition created by another, are not generally treated as giving rise to a right to indemnity." *Id.* at 156 (footnote omitted).

Decisions involving motor vehicle accidents are instructive. In *Crouch v. Tourtelot,* 350 S.W.2d 799 (Mo.1961) (en banc), Crouch had collided with the rear of another car that was ahead of him on a highway. *Id.* at 801. One of Crouch's front headlights was damaged in the accident, which occurred at dusk or later, but the car was operable. *Id.* Crouch alighted from the vehicle, leaving it standing in " 'the left hand lane.' " *Id.* Several minutes later Brown, driving in the opposite direction, collided with the front of Crouch's car. *Id.* at 802. Crouch's passenger sued Brown's administrator, who thereafter asserted a third-party claim for indemnity against Crouch. *Id.* at 801–02. That third-party claim was dismissed on a motion for failure to state a claim. *Id.* at 802. The Supreme Court of Missouri affirmed, saying: "We do not believe that indemnity should be required as between joint tort-feasors involved in a two-car automobile collision on a highway because of supposedly different types or degrees of negligence." *Id.* at 807.

In reaching that conclusion the *Crouch* court adopted the analysis applied by a Missouri intermediate appellate court in litigation arising out of a collision between a street car and an automobile in which the street car company sought indemnity from the automobile driver for the claim of a passenger against the company:

" ' "Without multiplying instances, it is clear that the right of a person vicariously or secondarily liable for a tort to recover from one primarily liable has been universally recognized. But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law

or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible. In the case of *concurrent* or *joint* tort-feasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other." ' The court declined to base its decision upon 'a consideration of the disproportionate duties owed by one tortfeasor to the other, where both have breached substantially equal duties owed the injured person * * *.' "

*Id.* at 805 (quoting *State ex rel. Siegel v. McLaughlin*, 315 S.W.2d 499, 507–08 (Mo. Ct.App. 1958)).

A claim for indemnification arising out of a motor vehicle accident was rejected as a matter of law in *Hood v. Dealers Transp. Co.*, 472 F.Supp. 250 (N.D.Miss.1979). In that case, the accident occurred when the operator of a pickup truck attempted a left turn and a vehicle operated by the defendant attempted to pass the truck. *Id.* at 251–52. A minor child of the truck operator, who was riding as a passenger in the truck, was killed in the accident. *Id.* The operator of the truck, alleging that he had given a proper left turn signal, filed suit asserting wrongful death and other claims. *Id.* The defendant counterclaimed, alleging failure to give a proper turn signal. *Id.* at 252. The court dismissed this counterclaim for indemnification for failure to state a claim. *Id.* The facts, said the court, created "a classic joint tortfeasor situation" and not one involving active negligence on the part of the counterclaim defendant and passive negligence on the part of the defendant. *Id.*

The court further said:

"When the negligence of two or more persons in the operation of motor vehicles on the highway results in injury

or damage to a person, it is an unusual case where the negligence causing the injury does not result from the activities of joint tortfeasors as distinguished from an active-passive negligence situation."

*Id.*

██ In the instant matter the jury found concurrent negligence, and Franklin's premise is that the negligence of Jiffy Lube is active. Inasmuch as the negligence of Franklin arose out of the operation of his automobile, Franklin's negligence is also active, as a matter of law.

██ It is well established under Maryland law that one who is guilty of active negligence cannot obtain tort indemnification. In the older cases the persons whose breaches of duty concurred in injuring the plaintiff were said to be *in pari delicto. See Baltimore & Ohio R.R. Co. v. County Comm'rs of Howard County,* 113 Md. 404, 414–16, 77 A. 930, 933–34 (1910); *Baltimore & Ohio R.R. Co. v. County Comm'rs of Howard County,* 111 Md. 176, 185–86, 73 A. 656, 658–59 (1909); *see also Westfarm Assocs. Ltd. Partnership v. International Fabricare Inst.,* 846 F.Supp. 422, 437–38 (D.Md. 1993), *aff'd sub nom. Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n,* 66 F.3d 669 (4th Cir.1995), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996); *Pyramid Condominium Ass'n v. Morgan,* 606 F.Supp. 592, 596 (D.Md.1985); *Blockston v. United States,* 278 F.Supp. 576, 583–88 (D.Md.1968); *State v. Capital Airlines, Inc.,* 280 F.Supp. 648, 650 (S.D.N.Y.1964); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 277–80, 674 A.2d 106, 135–37 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Schreiber v. Cherry Hill Constr. Co.,* 105 Md.App. 462, 478–79, 660 A.2d 970, 978–79, *cert. denied,* 340 Md. 500, 667 A.2d 341 (1995).

Under the active-passive analysis, Franklin's negligence is active, and, accordingly, tort indemnification is not available to him.

D

Franklin particularly emphasized at oral argument his contention that a sufficiently great disproportion between the negligence of two joint tortfeasors confers a right on the party whose fault is lesser to indemnification from the party whose fault is greater. In support of this argument Franklin quotes language from two opinions, *Hartford*, 109 Md.App. at 277, 674 A.2d at 135 ("[A] right to indemnification may lie, notwithstanding the parties' joint and several liability, when there is a considerable difference in the degree of fault among the wrongdoers."), and *Pyramid*, 606 F.Supp. at 595 (Tort indemnification lies "where the character of one tortfeasor's conduct is significantly different from that of another who is also liable for the same damages.").

The *Hartford* court cited *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.*, 693 F.2d 1 (1st Cir.1982), in support of the statement quoted above. *Araujo* is a case in which the alleged indemnitor was not liable to the plaintiff. *Id.* at 3. The *Araujo* court made a statement similar to the one included in *Hartford* as part of an introductory overview of the law. *Id.* at 2. The opinion in *Araujo* cites as its support *Zapico v. Bucyrus–Erie Co.*, 579 F.2d 714, 718 (2d Cir.1978). The statement in *Zapico*, relied on in *Araujo*, is, in turn, taken from another opinion which discusses the development of tort indemnification as an outgrowth of the common law prohibition against contribution among joint tortfeasors. In context the statement in *Hartford* is an attempt at a unifying theory explaining the cases in which indemnity is awarded. The statement does not support a wholly new basis for indemnification based on degrees of fault that are determined, under Franklin's argument, by a jury.

Similarly, the statement in *Pyramid* appears in an introductory overview and is merely an attempt to reduce to a single principle the instances in which tort indemnification is granted. *Pyramid*, 606 F.Supp. at 595. *Pyramid* was an action by a condominium association against the builder-developer who in turn impleaded the construction lender. *Id.* at 594–95.

The holding of the case is that the negligence alleged against the builder-developer was active, thus barring indemnity from the third-party defendant. *Id.* at 596–97.

Less wide of the mark of Franklin's argument is *Baltimore & Ohio R.R. Co. v. County Comm'rs of Howard County*, 113 Md. 404, 77 A. 930 (1910). There the local government sought indemnification from a railroad which had created an unsafe condition in a public road resulting in an accident causing the death of the plaintiff's decedent. *Id.* at 411, 77 A. at 932. The accident occurred three years after the roadway had been altered by the railroad, and there was undisputed evidence that the local government had actual notice of the condition of the road. *Id.* This Court affirmed a judgment for the local government, based on a jury verdict, on the basis

"that the defendant [railroad] was the sole actual wrongdoer and creator of the dangerous condition in the highway. Of course the plaintiff under the circumstances was greatly negligent in not repairing the road, and was liable for the unfortunate result which followed; but the Court could not say as a matter of law upon the facts before it that it participated with the defendant in the creation of this dangerous nuisance or that it was equally guilty with it with respect to the consequences which ensued."

*Id.* at 416–17, 77 A. at 934.

The *Howard County* case is either in conflict with, or enlarges, the rule stated in *Chesapeake & Ohio Canal Co. v. County Comm'rs of Allegany County*, 57 Md. 201 (1881), a decision which *Howard County* does not cite. In *Allegany County* the canal company was negligent in maintaining a bridge built by it to restore a county road that had been severed during the construction of the canal. *Id.* at 215. This Court stated the following rule:

"While the decisions are uniform that public necessity, and the nature of their obligations, require that municipal corporations should be held liable for the safety of their thoroughfares, the doctrine of *pari delicto*, though frequently invoked against them, has never been applied because of

their constructive default when they have sought re-imbursement from the actual authors of the trespass, or nuisance which has caused them to be sued."
*Id.* at 223. Under the evidence in *Allegany County*, the Commissioners could not "be charged with more than a constructive default. It [was] not even in proof that the defect in the bridge was known to the Commissioners, or that it was plainly obvious or of long standing." *Id.* at 223–24. The Court further observed that, if the Commissioners had known of the defect and demanded that the canal company make repairs, and the canal company had failed to do so, the Commissioners would have had the right to repair and to obtain indemnity from the canal company for that necessary outlay. *Id.* at 224.

*Howard County* in great measure relied upon *Gray v. Boston Gas Light Co.*, 114 Mass. 149 (1873), an action for indemnity by a property owner for the amount paid in settlement to a passerby on a public street whose property was damaged by the collapse of the plaintiff's chimney. *Id.* at 152. In the indemnification action the jury found specially that the collapse of the chimney was caused by the indemnitor's having attached to the chimney, without permission, a telegraph line, the weight of which pulled the chimney down. *Id.* The court pointed out that the building owner-indemnitee could not "protect himself from liability [to the passerby], because [the building owner] did not in fact know that the building was unsafe." *Id.* at 153.

*Howard County* also cites, *inter alia, Inhabitants of West Boylston v. Mason*, 102 Mass. 341 (1869), a case in which the municipality had actual knowledge that a pile of dirt had been left in a highway by the defendant-indemnitor. *Id.* at 341. The municipality, in an underlying tort suit, had paid the judgment entered against it. *Id.* at 341–42. It was entitled to indemnity based on jury findings that the injury to the tort plaintiff "was solely caused by a defect in the highway occasioned by an obstruction placed there by the defendant ...; that the original defect had not been rendered more dangerous by the act of the [municipality]; and that [the municipali-

ty] had not contributed by [its] acts to the accident." *Id.* at 343. In the matter now before us the jury found that the accident was caused by both Franklin and Jiffy Lube. Franklin's liability to the Plaintiff was not based on a special relationship and duty comparable to that of a municipality and a user of its streets.

Because the case before us does not involve the relationship of a municipality and the users of its public ways, it is unnecessary for us to determine whether the rule in Maryland is that stated in *Allegany County* or whether *Howard County's* expansion beyond *Allegany County* and beyond the position of the Restatement § 886B(2)(f) correctly states the Maryland law concerning defects in public streets.

*Howard County* also states that indemnity lies unless there is "joint participation in the tort and the parties [are] in equal degree guilty in a case of [that] nature." *Howard County,* 113 Md. at 414, 77 A. at 933. To the extent that that statement of the rule would permit indemnification from a tortfeasor whose negligence is in any degree greater than that of the alleged indemnitee, the statement is no longer the law, for the reason set forth below. Such a rule would go beyond Franklin's argument that total indemnification may be based on "a great disparity in the degree of fault among the wrongdoers." *Hartford,* 109 Md.App. at 277, 674 A.2d at 135.

We do not discern any substantial difference between Franklin's position, or a rule allowing indemnification where there is non-equal negligence, and a tort system of comparative fault. Maryland law does not recognize comparative negligence. *See Harrison v. Montgomery County Bd. of Educ.,* 295 Md. 442, 456 A.2d 894 (1983). We have great difficulty understanding how a jury would make the necessary determination of great disparity in fault without assigning percentages of fault to the conduct of the joint tortfeasors or, at a minimum, pigeonholing the conduct of the joint tortfeasors into categories adjectively labeled to represent varying degrees of fault. In states in which some form of comparative negligence is the law, courts have held that total loss-shifting

is inconsistent with comparative fault, and they no longer recognize tort indemnification. *See Vertecs Corp. v. Reichhold Chems., Inc.*, 661 P.2d 619 (Alaska 1983); *Taggart v. State*, 45 Cal.App.3d 768, 119 Cal.Rptr. 696 (1975); *Allison v. Shell Oil Co.*, 113 Ill.2d 26, 99 Ill.Dec. 115, 495 N.E.2d 496 (1986); *Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc. (In re Consolidated Vista Hills Retaining Wall Litig.)*, 119 N.M. 542, 893 P.2d 438 (1995); *Owens v. Truckstops of Am.*, 915 S.W.2d 420 (Tenn.1996); *Pachowitz v. Milwaukee & Suburban Transp. Corp.*, 56 Wis.2d 383, 202 N.W.2d 268 (1972).

In addition, a system of comparative fault for indemnification would be inconsistent with UCATA. That statute apportions the liability among joint tortfeasors on a pro rata basis, without regard to the degrees of fault. CJ §§ 3–1402 through 3–1405. Once the determination has been made that two or more parties are joint tortfeasors, UCATA does not concern itself with the relative degrees of fault between the parties.

We note that the 1939 version of UCATA promulgated by the National Conference of Commissioners on Uniform State Laws contained in § 2(4) an optional provision. *Compare* Unif. Contribution Among Tortfeasors Act § 2, 9 U.L.A. 157–58 (1951), *with* Maryland Code (1939, 1947 Cum.Supp.), Art. 50, § 22. The optional section provided for apportionment which was

> "intended to work as follows: If the evidence indicates that there is a disproportion of fault as among the tortfeasors, the court shall instruct the jury that if it finds the tortfeasors to have been negligent, they shall also fix their relative degrees of fault."

9 U.L.A. at 159. That optional provision was not adopted in Maryland, thereby indicating a legislative intent that loss-shifting not be accomplished by comparative negligence.

■ UCATA also contains a provision that it "does not impair any right of indemnity under existing law." CJ § 3–1406. That provision dates to the original enactment of UCATA by Chapter 344 of the Acts of 1941. Maryland indemnity law at that time, and to date, does not recognize a

distinction between contribution and indemnity based on degrees of negligence, as opposed to the relationship between the parties or whether the negligence of the tortfeasors was "active" or "passive."

For these reasons we reject Franklin's "great disparity" argument.

## II

Franklin argues that the trial court abused its discretion in failing to grant his pretrial motion to have the existence and terms of the Release and Indemnity Agreement disclosed to the jury. Franklin contends that the settlement agreement was collusive in that it required Jiffy Lube to remain in the litigation for the sole purpose of assisting the Plaintiff in the prosecution of his claims against Franklin. Jiffy Lube had no financial interest in the outcome of the litigation, Franklin asserts, because (1) the Plaintiff fully released Jiffy Lube from liability; (2) the Plaintiff agreed to indemnify and hold Jiffy Lube harmless with respect to Franklin's cross-claim for contribution and indemnity; (3) Jiffy Lube's cross-claim against Franklin for contribution was a nullity because, under the release and UCATA, Jiffy Lube had no claim for contribution against Franklin; and (4) the settling defendants agreed to permit the Plaintiff to contact and utilize any experts that the settling defendants "now have or maintain" and to cooperate with the Plaintiff in the presentation of his claims against Franklin. Agreements such as the one entered into by the Plaintiff and the settling defendants, argues Franklin, should be revealed to the jury, or, in the alternative, should be prohibited entirely.

The Plaintiff contends that the release was not one of which the jury should have been advised, and he points to the following facts in support: (1) the Plaintiff dismissed his claim against Jiffy Lube prior to the start of trial, and Jiffy Lube remained in the litigation solely to defend itself against Franklin's cross-claim for indemnity and contribution; (2) all parties and the trial judge learned of the terms of the settlement

agreement four weeks before trial; (3) all parties and the trial judge received an unsigned copy of the release prior to the commencement of trial; and (4) the trial judge informed the jury that the Plaintiff had dismissed his claims against Jiffy Lube and National Carriers. Jiffy Lube echoes the arguments of the Plaintiff.

■ Franklin's submission takes us into the realm of "Mary Carter" agreements.[12] The name is used to describe settlement agreements that, under certain circumstances, create a " 'sham of adversity.' " *Elbaor v. Smith*, 845 S.W.2d 240, 249 (Tex.1992) (quoting J.F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U. Fla. L.Rev. 521, 574 (1986)). That is, parties to a settlement agreement may deceive juries by proceeding at trial as if their interests were adverse to one another, when in fact, their claims against each other are no longer extant. As stated by the Supreme Court of Florida in *Dosdourian v. Carsten*, 624 So.2d 241 (Fla.1993):

> " 'Jurors are ... deceived by being informed that they are resolving an existing dispute between parties that have already resolved their differences. In our view, this undermines the integrity of the jury system which exists to fairly resolve actual disputes between our citizens.' "

*Id.* at 243 (quoting *Dosdourian v. Carsten*, 580 So.2d 869, 872 (Fla.Dist.Ct.App.1991), *decision quashed by* 624 So.2d 241 (Fla.1993)).

■ In *General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980), this Court ordered a new trial on the appeal of a non-settling defendant against whom judgment had been entered in favor of the plaintiff. *Id.* at 730, 410 A.2d at 1047. The basis for the new trial was that the trial court had denied the non-settling defendant's request that the settlement agreement between the plaintiff and the settling defendant be disclosed to the jury. *Id.* at 720, 410 A.2d at 1042. That agreement, *inter alia*, gave the settling defendant

---

**12.** These agreements take their name from the case of *Booth v. Mary Carter Pa⁺nt Co.*, 202 So.2d 8 (Fla.Dist.Ct.App.1967) (per curiam).

a direct financial incentive to have the non-settling defendant found liable. *Id.* at 718–19, 410 A.2d at 1041–42. Our review in *Lahocki* of decisions concerning Mary Carter agreements led to the conclusion that they seemed to contain each of three features, specifically:

"(1) The agreeing defendant is to remain a party and is to defend himself in court. However, his liability is limited by the agreement. In some instances this will call for increased liability on the part of other co-defendants. (2) The agreement is secret. (3) The agreeing defendant guarantees to the plaintiff that he will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement."

*Id.* at 720, 410 A.2d at 1042. If a settlement agreement meets these criteria, and a party requests its disclosure to the jury, its terms ordinarily should be disclosed either by presenting the jury with the agreement itself or by reciting to the jury the terms of the agreement. *Id.* at 730, 410 A.2d at 1047.

The first *Lahocki* criterion is that the settling defendant remain a party to the litigation and defend itself at trial. See *Auto Village, Inc. v. Sipe*, 63 Md.App. 280, 286, 492 A.2d 910, 913 ("[I]n order to satisfy this prong, the settling defendant must remain as a party defendant."), *cert. denied*, 304 Md. 296, 498 A.2d 1183 (1985). In the instant case Jiffy Lube did limit its liability by contract, participate in the trial, and defend itself. It did so, however, not because this participation was required under the terms of the agreement with the Plaintiff, but because Franklin continued to maintain his cross-claim for indemnity and contribution against Jiffy Lube.

Franklin contends that, although nominally a party to the litigation, Jiffy Lube had no financial interest in the outcome of the trial because the Plaintiff covenanted to indemnify Jiffy Lube with respect to Franklin's cross-claim and because Jiffy Lube's cross-claim against Franklin for contribution was a nullity. Actually, Jiffy Lube had a financial stake in avoiding a determination against it. The jury found that Jiffy Lube

was negligent and that its negligence was a proximate cause of the accident. If Franklin were adjudged to have a right to be indemnified by Jiffy Lube, Jiffy Lube faced the risk that its claim for contractual indemnity against the Plaintiff might not be collectible. The monetary consideration for the release was paid jointly to the Plaintiff and his counsel and was subject to reduction by the amount of legal fee earned by counsel. A finding that exonerated Jiffy Lube *vis-a-vis* the Plaintiff or Franklin would be more advantageous to Jiffy Lube than trying to collect from the Plaintiff on a contract claim.

Franklin also maintains that the *Lahocki* secrecy factor was satisfied in the instant action because the settlement agreement was kept secret from Franklin and from the jury. These contentions are without merit.

On August 31, 1995, the Plaintiff and the settling defendants informed the court, Franklin, and a representative of Franklin's insurance company that they had entered into a settlement agreement. The Plaintiff placed the financial terms of the agreement on the court record. Although the Release and Indemnity Agreement was not executed until September 25, 1995, both Franklin and the court were aware of its existence and its financial terms four weeks before trial. The trial court recognized this fact at the post-trial motions hearing. Furthermore, both Franklin and the court received a draft copy of the release the weekend prior to the start of trial. *Cf. C & K Lord, Inc. v. Carter,* 74 Md.App. 68, 76–77, 536 A.2d 699, 703 (1988) (settlement agreement held not secret where settling parties merely informed the court and the non-settling defendant that the settling parties had entered into a release agreement and did not disclose any of the agreement's terms until after the jury had rendered its verdict).

■ Contrary to Franklin's contentions, the secrecy element of a Mary Carter agreement is not satisfied simply because the settlement agreement is kept from the jury. *See id.* Indeed, the entire purpose of the three-factor *Lahocki* test is to determine *whether* a settlement agreement should be

disclosed to the jury. In any event, the jury was made aware at the outset of trial of the true nature of the controversy when the trial judge stated:

"[A]s far as the plaintiff, Mr. Morrison in his individual capacity and that as a personal representative of the estates of Mrs. Morrison and the two minor children, they have resolved their matters and will not be proceeding against the defendants National Carriers, Mettenbrink and also as far as the defendant Lube 495 also known as Jiffy Lube."

The agreement does appear to meet that element of *Lahocki* under which "[t]he agreeing defendant guarantees to the plaintiff that he will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement." *Lahocki*, 286 Md. at 720, 410 A.2d at 1042.

For cases similar to *Lahocki*, where courts have acknowledged the potential unfairness of collusive settlement agreements yet permitted such agreements provided their existence is made known to the jury, see *Firestone Tire & Rubber Co. v. Little*, 276 Ark. 511, 639 S.W.2d 726 (1982); *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063 (1985); *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983).

Although the agreement of release contains promises by the settling defendants to cooperate with the Plaintiff, including permitting him to contact and utilize experts, there is no evidence that any expert engaged or consulted by a settling defendant testified for the Plaintiff. Nor has Franklin been able to point to any "cooperation" between the Plaintiff and any settling defendant that was improperly prejudicial to Franklin. For example, Franklin complained to the trial court that, in final arguments, both the Plaintiff and Jiffy Lube would argue that Franklin was negligent. That type of duplication in final arguments was appropriate under the circumstances.

Trial judges have the power, exercisable at their discretion, to order disclosure to the jury of a settlement

agreement, if that action appears to be necessary in order for there to be a fair trial. That determination is wedded to the circumstances of the particular case. The elements of a Mary Carter agreement identified in *Lahocki* are guidance in that determination, but they are not exclusive or exhaustive. Under the circumstances of the case before us, we hold that the trial court did not abuse its discretion in denying Franklin's request that the terms of the settlement agreement be disclosed to the jury.

### III

The third question on which we granted certiorari involves the amount of credit against the $6,806,000 verdict to which Franklin is entitled. In one sense the issue is whether the settling defendants should be considered jointly or severally in the calculation. The trial court held, in agreement with the Plaintiff's position, that the credit was Jiffy Lube's pro rata share, *i.e.*, $3,403,000, because that was greater than the amount contributed by Jiffy Lube for the release. Franklin's position is that the credit is $3.7 million, representing the total monetary consideration to the Plaintiff for the release, including the amount contributed by National Carriers.

The parties to the settlement used a single document to evidence the release of Jiffy Lube and National Carriers. Franklin particularly relies on that portion of the release providing that, if the "settling defendants or any of them is determined" to be a joint tortfeasor, then the Plaintiff's recovery will be reduced by a pro rata share "or to the extent of the amount paid for this Release by settling defendants herein, whichever is greater, in accordance with [UCATA]." Immediately following the quoted sentence the release reads: "The said reduction effected hereby shall not be construed to affect the recovery in any suit, cause of action or claim in which the settling defendants herein, or any of them, shall not have been adjudged legally liable for contribution."

Franklin's argument is that the use of the plural in referring to the amount paid "by settling defendants" means that

the credit is the total of the contributions to the settlement made by National Carriers and Jiffy Lube. The release, however, contains what is in effect a definitional provision which permits the words, "settling defendants," to be read either in the singular or the plural.[13] In the portion of the release on which Franklin relies, the amount paid by "settling defendants" is to be compared with "the pro-rata share recoverable by law from settling defendants herein." The pro rata share recoverable by law is recoverable only from one who is determined to be, or who by contract is agreed to be treated as, a joint tortfeasor. *See Allgood v. Mueller*, 307 Md. 350, 513 A.2d 915 (1986). In the instant matter the Plaintiff did not agree to treat any settling defendant as a joint tortfeasor, and National Carriers was determined not to be a joint tortfeasor. Thus, the "pro-rata share recoverable by law" would apply only to Jiffy Lube and, under the contractual definitions, "settling defendants" in that instance would be read to mean Jiffy Lube only. Because "settling defendants," when referring to the amount paid for the release, is used in the same context, the same singular meaning of "settling defendants" is appropriate, and it means Jiffy Lube only.

Moreover, the release provides a rule of construction applicable to the provisions concerning reduction. They are "not [to] be construed to affect the recovery in any ... claim" against a settling defendant who "shall not have been adjudged legally liable for contribution." Franklin's argument seeks as a credit against the judgment an amount in excess of the consideration paid by Jiffy Lube and in excess of Jiffy Lube's pro rata share. The additional amount sought by Franklin reduces the Plaintiff's recovery by funds attributable to National Carriers and thus violates the provision governing construction of the reduction provisions in the release.

---

**13.** The release discharges "National Carriers ... and ... Jiffy Lube, any of their predecessors, successors and assigns, and/or any of their agents, servants, officers and directors, attorneys and employees of all such corporations (any and all of whom may be hereinafter individually or collectively referred to as the 'settling defendants')."

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, MICHAEL FRANKLIN.*