942 A.2d 722

## PULTE HOME CORPORATION

### v.

## PAREX, INC., et al.

**No. 62, Sept. Term, 2007.**

Court of Appeals of Maryland.

Feb. 14, 2008.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, specially assigned) and DALE R. CATHELL (Retired, specially assigned), JJ.

WILNER, J.

This action began as a product liability case involving a defective building material intended for use in residential construction. The product was a synthetic exterior stucco finish known as the Exterior Insulation and Finish System (EIFS). Between 1994 and 1998, petitioner, Pulte Home Corporation, built 77 homes using that system. When the system failed to prevent water penetration, as it was allegedly designed and warranted to do, and some of the home buyers made claims, Pulte corrected the problem and took an assignment of the home buyers' rights. Pulte claimed that the 77 homes had to be completely "reclad" at an average cost of $50,000 per home.

The appeal now before us arises from Pulte's effort to recover its losses, which, together with interest and various charges, it calculated to be in excess of $5.2 million. As the result of settlements with three of the defendants, certain rulings by the Circuit Court for Montgomery County, and

additional rulings by the Court of Special Appeals, Pulte ended up with only $1,450,000, of which half came from its settlements, and it contends that it is entitled to substantially more. We shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

In 2001, Pulte, in part on its own behalf and in part as assignee of the home buyers, filed suit in the Circuit Court for Montgomery County against four categories of defendants. One defendant was respondent Parex, Inc., which designed, manufactured, and, through distributors, sold the EIFS product. The second category consisted of two alleged distributors of the product—American EIFS Stone & Stucco, Inc. (American EIFS) and American Stucco and Stone, L.L.C. (American Stucco). American EIFS, which later traded as American Stucco, obtained the product from Parex and supplied it either to Pulte or to the third set of defendants—Coronado Corporation (Coronado) and CSS, L.L.C. (CSS). Those companies, acting as subcontractors of Pulte, installed the product in the Pulte-built homes. Finally, Pulte sued Bernard and Benjamin Franks, the alleged owners, officers, directors, or controlling parties of American EIFS, American Stucco, Coronado, and CSS. They were sued, essentially, as the *alter ego* of their companies, who exercised sufficient control over them to justify "piercing the corporate veil."

Pulte's case proceeded to the point of trial on its Third Amended Complaint, which contained the following 15 counts:

(1) Count 1 alleged negligence against all defendants except Parex. Coronado, CSS, and the Franks—the installers—were charged with improper installation of the EIFS product; the complaint against American EIFS and American Stucco—the distributors—was their failure to obtain a written warranty that was offered by Parex.

(2) Count 2 charged Coronado, CSS, and the Franks with various breaches of the subcontracts entered into with Pulte, including the obligation to perform in a workmanlike manner

and to require that suppliers indemnify Pulte from losses arising from their materials.

(3) Count 3 charged all parties except Parex with breach of express warranties. The distributors allegedly warranted the EIFS products they sold, and the installers warranted that the products would be free from defects and would be properly installed.

(4) Count 4 charged all defendants with breaches of an implied warranties of merchantability and that the EIFS product was fit for the particular purpose of residential construction.

(5) There is no Count 5 in the Third Amended Complaint. Count 6 charged Parex with negligence and strict liability in the design of the EIFS product—failure to design the product to be free from defects that prevented the product from properly performing and strict liability because the product was inherently defective in permitting water intrusion that caused damage to other property.

(6) Count 7 alleged negligence and strict liability against all defendants for failure to warn of the defects in the EIFS product.

(7) Count 8 alleged actual fraud against Parex—false representations and concealments on which Pulte relied in using the product.

(8) Count 9 charged all defendants with negligent misrepresentation concerning the ability of the EIFS product to prevent water intrusion, the nature of the product, and its life expectancy and maintenance.

(9) Count 10 alleged constructive fraud against all defendants, based on the alternative supposition that the misrepresentations made by them were made "negligently or innocently" but with the intent that Pulte rely on those misrepresentations.

(10) Count 11 charged Coronado, CSS, and the Franks with actual fraud concerning Coronado's financial problems and the relationship between Coronado and CSS, as a result of which,

both companies were left with insufficient assets to honor their indemnity obligations.

(11) Count 12, captioned "Negligent Misrepresentation," charged Coronado, CSS, and the Franks with knowingly and intentionally making material misrepresentations regarding Coronado's financial problems and the relationship between Coronado and CSS.

(12) Count 13 charged Coronado, CSS, and the Franks with constructive fraud, on the basis that the misrepresentations regarding Coronado and CSS may have been made negligently or innocently.

(13) Count 14 charged Parex, American EIFS, American Stucco, and the Franks with false advertising in violation of a Virginia statute.

(14) Count 15 sought recovery against Coronado, CSS, and the Franks for contractual indemnification under the subcontracts with Pulte.

(15) Finally, Count 16 claimed subrogation against all defendants, based on Pulte's having repaired the homes in which the defective product was installed and thus being subrogated to the rights that the home buyers had.

The intermediary defendants—American EIFS, American Stucco, Coronado, CSS, and the Franks—each filed cross-claims against Parex and, to some extent, against each other. The amended cross-claims of Coronado and CSS were similar in nature. They alleged, in pertinent part:

(1) As subcontractors of Pulte, Coronado and CSS purchased the EIFS product from American EIFS and American Stucco, which purchased it from Parex;

(2) At the time American EIFS, American Stucco, and Parex sold the product, they expressly and impliedly warranted that the product was free from defects, fit for the purpose of residential construction, and merchantable, and should it be determined that the product *was* defective, the cross-claimants would be entitled to indemnification from American EIFS,

American Stucco, and Parex based on their breach of warranties; and

(3) Should Pulte succeed on a theory of negligence, the cross-claimants' negligence was passive while that of American EIFS, American Stucco, and Parex was active, thereby entitling the cross-claimants to (i) indemnity, and (ii) contribution as a joint tortfeasor.

In its cross-claim against Parex, American EIFS averred that it was a distributor of EIFS product used in the homes constructed by Pulte and that it purchased that product from Parex. It alleged that, at the time Parex sold the product, it expressly and impliedly warranted that the product was free from defects, that it was fit for residential construction, and that it was merchantable. As did Coronado and CSS, American EIFS claimed that, to the extent Pulte was entitled to recover from it based on the product being defective or on the ground of negligence, American EIFS was entitled to indemnification and contribution from Parex and to judgment against Parex for breach of contract. American Stucco's cross-claim, which was against Parex and CSS, sought (1) indemnification from them with respect to any portion of Pulte's damages under the doctrines of strict liability, breach of express or implied warranty as to fitness or merchantability, active/passive negligence, and equitable indemnification/subrogation, and (2) contribution as joint tortfeasors.

As the result of rulings on motions to dismiss and for summary judgment, all of Pulte's claims against Parex, except the false advertising claim in Count XIV, were dismissed prior to trial, many of them because of a lack of privity between Pulte and Parex. In addition, all of Pulte's claims against American Stucco were dismissed on the ground that American Stucco was not a properly formed entity when the product was installed in the various homes, and a number of claims against Coronado, CSS, and American EIFS were also dismissed. The correctness of those rulings is not challenged in this appeal. What remained open for trial were:

(1) As to Parex, only Count XIV (false advertising);

(2) As to Coronado, Counts I, II, III, IX, X, XII, XIII, and XV;

(3) As to CSS and the Franks, the same counts as against Coronado except Count III; and

(4) As to American EIFS, Counts I, III, IX, and X.

On the first morning of trial, Pulte entered into settlement agreements with American EIFS, Coronado, and CSS, and their respective insurers. Those agreements provided, in pertinent part, that:

(1) CSS and Coronado admitted Pulte's allegations in the remaining counts against them, which embraced Count I (negligence). Those defendants agreed to the entry of judgment in the amount of $4,079,772 plus $611,966 for "overhead allowance," and $975,762 in pre-judgment interest, for a subtotal of $5,667,500, plus costs and reasonable attorneys' fees.

(2) American EIFS admitted the allegations in the remaining counts against it and agreed to the entry of judgment in the amount of $3,751,905, plus $562,786 for "overhead allowance," and pre-judgment interest of $914,609, for a subtotal of $5,229,300, plus costs and reasonable attorneys' fees.

(3) CSS and American EIFS agreed to a consent judgment in favor of CSS on its cross-claim against American EIFS in the amount of $5,229,300, plus costs and attorney's fees.

(4) Pulte dismissed all of its claims against Bernard and Benjamin Franks.

(5) Pulte dismissed with prejudice Counts XI (fraud), XII (negligent misrepresentation), and XIII (constructive fraud) against Coronado and CSS.

(6) Pulte agreed not to execute on the judgments against American EIFS, Coronado, and CSS or on the CSS cross-claim judgment against American EIFS.

(7) The insurers of those defendants agreed to pay, and did pay, Pulte $725,000. There was no breakdown as to how much was paid on behalf of any defendant or with respect to any claim; it was an aggregate sum on behalf of all three.

(8) The settling defendants assigned to Pulte all claims, rights, and actions they had against Parex or any third parties that arose from the facts related in the lawsuit, including all contractual, breach of warranty, and other claims against Parex, and they agreed to cooperate with Pulte in Pulte's pursuit of those claims by making the Franks and other expert witnesses available to Pulte.

The case proceeded to trial on Pulte's claim against Parex under Count XIV and on the remaining cross-claims by American EIFS, American Stucco, Coronado, or CSS against Parex that had been assigned to Pulte pursuant to the settlement agreements. At the end of the plaintiff's case, Parex moved for judgment on all of the claims against it. As to Count XIV, Parex noted that, in order for liability to exist under the Virginia statute, Pulte was required to show that either it or the home buyers had relied on written advertising by Parex, and there was no evidence of any such reliance. The court agreed and dismissed that count for that reason. Pulte does not complain about that ruling.

Parex regarded the assigned cross-claims as being for contribution as a joint tortfeasor and for indemnification. It noted that, to be liable for contribution, Parex must be shown to be a joint tortfeasor, but that, by dismissing all tort claims made against it by Pulte, either directly or as assignee of the home buyers, the court had concluded that it had no tort liability to them and therefore could not be a joint tortfeasor with the distributors or installers.

With respect to the claims for indemnification, Parex averred that, because, in their settlement agreements, Coronado and American EIFS had admitted liability to Pulte for their own negligence, they were not free of fault, and, not being free of fault, they had no indemnity claim against Parex. Alternatively, Parex argued that, even if indemnity claims survived, they would be limited to what the intermediaries actually paid. Parex urged that, because there was no privity between it and the installers (Coronado and CSS), their only claim for indemnity would be against American EIFS, from

whom they obtained the product, and there was no evidence of what, if anything, American EIFS had paid to them. Accordingly, none of them had an indemnity claim against Parex.

The court's ruling on the assigned cross-claims was announced *ex temporaneously* from the bench. The court did not mention the claims for contribution at all. It viewed the assigned cross-claims as resting on two theories—indemnification and implied warranty. With respect to indemnification, the court appeared to accept Parex's argument that the only indemnification claim was that which Coronado or CSS, the installers, had against American EIFS, the distributor, based on a defect in the product, and which American EIFS, to the extent of any payment to Coronado or CSS based on such a defect, would then have against Parex. The court concluded, however, that the evidence was lacking as to any such loss. The court assigned two reasons for that conclusion, the first being that Coronado was sued for negligence in the application of the product and that Pulte had failed to demonstrate how much of any loss sustained by Coronado was due to its own negligence in installation rather than by reason of any defect in the product. The second reason dealt with the lack of clarity in who Pulte or Coronado actually dealt with—whether it was CSS or American Stucco.

The court reached a different result with respect to what it regarded as the implied warranty theory of the cross-claims, as to which it held that privity of contract was not necessary and that the proof of damages was different. Pulte was suing as a consumer of the product, either in its own right or under the assignments from the home buyers, and the court was satisfied that it had sufficiently identified its damages to warrant submitting that theory to the jury.

Although Pulte claims otherwise, there can be little doubt that the court dismissed all aspects of the assigned cross-claims based on an indemnity theory. It announced that "the claim fails." It said that "the only remaining claim that exists is a claim by Coronado or CSS for breach of implied warranty of fitness for purpose and use, and the Court will allow the

case to proceed forward on that basis." It said that "[t]he cross-claim of American EIFS is for indemnification ... and is out of the case." When asked later to vacate that ruling, it announced:

"The Court carefully considered the arguments ... [a]nd it is my view that my original ruling on the dismissal of the indemnity claims was correct. And, as a result, the Court declines the motion to vacate and they will remain out of the case. On the other hand, the Court is not in accord with the defendants at this point and denies the motion for judgment on the warranty claims."

In conformance with those rulings, the court, at the conclusion of the case, instructed the jury, as to the cross-claims, only on a breach of implied warranty theory. It gave no instructions on indemnification. Indeed, the court rejected an instruction proposed by Pulte that characterized the cross-claims as a pass through of the cross-claimants' liability to Pulte "under an indemnification theory of breach of implied warranty." The instruction given was:

"The plaintiff bears the burden of proof by a preponderance of the evidence that its alleged damages arose from a breach of implied warranty. In other words, the plaintiff must demonstrate by a preponderance of the evidence that the damages it seeks were caused by an alleged defect in Parex's product."

Consistent with that instruction, the special verdict sheet given to the jury dealt only with the elements of breach of implied warranty and damages flowing therefrom; it too made no mention of indemnity.

One collateral issue submitted to the jury arose from a statute of limitations defense raised by Parex. As noted, the homes containing the EIFS system were built by Pulte commencing in 1994. The lawsuit was filed on June 14, 2001. Parex asserted that Pulte's claims were subject to the four-year statute of limitations set forth in Maryland Code, § 2–725 of the Commercial Law Article, Maryland's version of the Uniform Commercial Code (UCC), which would bar implied

warranty claims with respect to homes sold prior to June 14, 1997. Pulte contended that the applicable period of limitations was three years, as prescribed in § 5–101 of the Cts. & Jud. Proc. Article, but that the period did not begin to run until the consent judgments were entered against the settling defendants. Under that theory, none of the warranty claims would be barred. The court agreed with Parex and, in both a special instruction and on the special verdict sheet, directed the jury, if it found liability for breach of implied warranty, to identify, by number from an exhibit, each home incorporating a Parex product upon which there was delivery after June 14, 1997 and, as to each such house, to determine the damage suffered by CSS or Coronado.

In response to these instructions and the issues enumerated on the verdict sheet, the jury found, in pertinent part, that (1) the EIFS system was unfit for the particular purpose for which it was intended and was defective, (2) the defective product was delivered to 23 homes after June 14, 1997, (3) the damages sustained by CSS or Coronado amounted to $50,000 per home, or a total of $1,150,000, and (4) Pulte was entitled to pre-trial interest. Upon that verdict, the court entered judgment for Pulte in the amount of $1,150,000 plus $279,380 in pre-trial interest, for a total of $1,429,380.

Neither side was happy with that result, so cross-appeals were filed. Pulte complained that the Circuit Court erred (1) in applying the UCC statute of limitations, and (2) in dismissing its assigned American EIFS and American Stucco indemnity claims and Pulte's direct actions against Parex for breach of express warranty claim, breach of implied warranty, negligence, and legal subrogation. Parex raised nine issues, including the assertion that Pulte's recovery under the cross-claims of CSS and Coronado must be limited to the $725,000 paid by them under the settlement agreement, and that the allowance of prejudgment interest was in error.

In a reported opinion, the Court of Special Appeals rejected all complaints except two. It concluded that the Circuit Court had erred in entering summary judgment in favor of Parex on

the implied warranty claims brought by Pulte as assignee of American EIFS, but it also held that Pulte was not entitled, in pursuing the assigned cross-claims, to recover more than the $725,000 paid by American EIFS, CSS, and Coronado. In light of that latter conclusion, the court determined that there was no need for further proceedings on the American EIFS claim because it could not produce any greater recovery. The court remanded the case with instructions to enter judgment in favor of Pulte in the amount of $725,000. *See Pulte v. Parex*, 174 Md.App. 681, 923 A.2d 971 (2007).

We granted *certiorari* to consider three questions raised by Pulte: (1) whether the Court of Special Appeals erred in applying the "payment rule," rather than the "judgment rule," thereby limiting Pulte's damages to $725,000; (2) whether the Circuit Court erred in applying the UCC statute of limitations, which ran from the date of sale of the homes, rather than the general statute of limitations which, in Pulte's view, would run from the date of the consent judgments; and (3) whether the Court of Special Appeals erred in reversing the award of pre-judgment interest. Any issue not fairly included within those questions is not before us. We find no error in the intermediate appellate court's decision on the three issues noted, and we shall therefore affirm the judgment of that court.

## DISCUSSION

The foundation of all three arguments made by Pulte is that the assigned cross-claims by Coronado, CSS, and American EIFS were not actions under the UCC for breach of implied warranty but indemnity actions seeking reimbursement for the liability imposed on them by the consent judgments. From that premise flows the contentions that, as indemnity claims (1) the UCC statute of limitations was inapplicable, and limitations did not begin to run until the consent judgments were entered; (2) the "judgment rule" applies, under which Pulte, as assignee of the cross-claims, is entitled to recover the entire amount of the consent judgments and not just the $725,000 paid to Pulte by the cross-claimants; and (3) as those

judgments included pre-judgment interest, Pulte was entitled to that as well.

Parex's principal defense to these assertions is that the judgment rule applies only to indemnity cases, indeed to only certain types of indemnity cases, and that the cross-claims, as submitted to the jury, were not indemnity claims but merely actions for breach of implied warranty. Parex notes that the Circuit Court expressly dismissed the cross-claims to the extent they rested on an indemnity theory, that Pulte is no longer complaining about that ruling, and that, in any event, it waived its right to do so. Thus, according to Parex, all that Pulte, as assignee of the cross-claims, is entitled to recover from it, in light of the jury's verdict, is the amount of money that the cross-claimants actually paid to Pulte—$725,000. That was the loss suffered by the cross-claimants by reason of any breach of implied warranty by Parex.

There are essentially two issues here. First, what *was* the nature of the cross-claims? Were they the kind of indemnity claims to which the judgment rule is applicable or were they instead breach of warranty claims? Second, if they were breach of warranty claims, does the judgment rule nonetheless apply to them?

### Nature of the Cross–Claims

 The right to indemnity may arise from three circumstances or modalities. There is, first, express contractual indemnity, in which an indemnitor, by express contract, agrees to reimburse the indemnitee for a liability, loss, or damage that the indemnitee may incur that is within the scope of the indemnity. The commencement and scope of the obligation depends on the terms of the contract. As we pointed out in *Levin v. Friedman*, 271 Md. 438, 443–44, 317 A.2d 831, 834 (1974), indemnity agreements may provide (1) indemnity against *loss or damage*, under which the indemnitee may not recover until it has made payment or otherwise suffered an actual loss or damage within the scope of the indemnity; (2) indemnity against *liability*, under which an action may be brought as soon as the liability is legally imposed, as when

judgment is entered, even though no actual loss has yet been sustained (the judgment has not been paid); or (3) a promise by the indemnitor "to perform a certain act or make specified payments for the benefit of the indemnitee," under which an immediate right of action accrues upon the failure of the indemnitor to perform, regardless of whether any actual damage has been sustained. *See also London & Lancashire Indemnity Co. v. Cosgriff*, 144 Md. 660, 125 A. 529 (1924); *Dorsey v. Dashiell*, 1 Md. 198 (1851). The nature of the indemnity will determine not only when a right of action accrues but also the measure of damages that may be recovered.

A right of indemnity may also arise by implication, either of fact or by law. *See Franklin v. Morrison*, 350 Md. 144, 154, 711 A.2d 177, 182 (1998); *Hanscome v. Perry*, 75 Md.App. 605, 615, 542 A.2d 421, 426 (1988). A right of indemnity implied in fact may arise from a special relationship between the parties, usually contractual in nature, or from a course of conduct. As pointed out in *Hanscome*, not every contractual relationship will produce an implied indemnity. Rather, as noted in *Araujo v. Woods Hole, Martha's Vineyard, Etc.*, 693 F.2d 1, 2–3 (1st Cir.1982), "a contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility ... or when there is a generally recognized special relationship between the parties."

Finally, the right may be an equitable one implied by *law.* In *Franklin v. Morrison, supra,* 350 Md. at 154, 711 A.2d at 182, we observed that this third form of indemnity, which we characterized as tort indemnity, may exist between persons liable for a tort. We said that the basis of it "is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." *Id,* quoting from *Restatement (Second) of Torts*, § 886B cmt. *c.*

(1979).[1] The tort-based right is articulated as well in § 96 of the *Restatement of Restitution:*

"A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."

The principal holding in *Franklin* was a reconfirmation of the long-established view in Maryland that "one who is guilty of active negligence cannot obtain tort indemnification." *Id,* at 163, 711 A.2d at 187.

 In this case, Pulte has defined no express indemnity contract between Parex and itself or between Parex and any of the distributors or installers. Nor, as the Circuit Court concluded, is there any basis on which to find an implied indemnity, either in fact or in law. As to Coronado, there is, first of all, no clear evidence of the extent to which the loss or liability sustained by it through the consent judgments arose from any breach of implied warranty as opposed to its own negligence in installing the product, both of which were con-

---

1. The Court later quoted the text of § 886B as setting forth the "established applications" of the unjust enrichment principle:

"(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of liability.

(2) Instances in which indemnity is granted under this principle include the following:

(a) The indemnitee was liable only vicariously for the conduct of the indemnitor;

(b) The indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful;

(c) The indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied;

(d) The indemnitor supplied a defective chattel or performed defective work upon land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;

(e) The indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;

(f) The indemnitor was under a duty to the indemnitee to protect him from liability to the third person."

ceded.[2] To the extent Coronado was negligent in installing the product, that negligence would be active, not passive, and, under the law reconfirmed in *Franklin*, would preclude any tort-based indemnity. Second, because the only asserted loss was economic loss and because there was no privity between Coronado and CSS, on the one hand, and Parex, on the other, any right to indemnification based on implied warranty would be against American EIFS, which sold them the product. As the Circuit Court pointed out, however, there was no evidence of what loss, if any, American EIFS sustained to Coronado or CSS, its customers, and therefore it had failed to establish an indemnity claim against Parex.

It is evident from this analysis that the assigned cross-claims do not fall within any of the three recognized categories of indemnity actions and therefore do not constitute indemnity actions. Yet claims of this kind have been, and should be, recognized. They are recognized, however, for what they are—actions for breach of implied warranty in which consequential damages are sought.

CL § 2–714(2) sets forth the general rule governing damages for breach of warranty:

> "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages in a different amount."

Section 2–714(3), however, provides that "[i]n a proper case any incidental and consequential damages under the next section may also be recovered." Section 2–715(2)(b)—part of the next section—allows consequential damages for "[i]njury to person or property proximately resulting from any breach of warranty." This appears to be the theory under which

---

2. The Settlement Agreement contained an acknowledgment that, for purposes of the consent judgments against Coronado, CSS, and American EIFS, Pulte's claims consisted *"primarily* of allegations of product defectiveness" (emphasis added) but did not exclude the allegations of negligence in the Third Amended Complaint.

recovery may be allowed when the immediate buyer of defective goods sustains a loss or liability to a third party because of a resale or installation of the defective goods. Professor Roy R. Anderson (Southern Methodist University Law School) observes:

> "A buyer who purchases defective goods may become liable to third parties if he resells the goods to them or the defect causes personal injury or property damage. Third-party claims may thus cause the buyer consequential damages for which the seller should indemnify him. These types of indemnity claims have been allowed in numerous Code cases."

2 Roy Ryden Anderson, *Damages Under the Uniform Commercial Code* § 11.32 at 11–129 (2d ed.2003). Anderson qualifies that statement, however, by pointing out:

> "Although a breach of warranty action against a seller for consequential damages for liability arising from a third-party claim is similar to a claim for indemnification, to the extent that it makes a difference under local rules, it should be treated as a simple claim for consequential damages and not be subjected to special rules for indemnification claims. This has been the general attitude of the courts in Code cases and is supported by the Restatement of Contracts [although] [o]ccasionally a court misses the point."

*Id.* at 11–132 (footnotes omitted).

That, we believe, is the better and cleaner way to regard these kinds of actions. It allows a proper recovery under a theory already well recognized both in the UCC and in the common law of contracts, and it avoids collateral problems which might arise from trying to stretch the well-established nature of indemnity actions to cover what is essentially a breach of warranty claim when it is not necessary to do so. The Circuit Court was correct, therefore, in holding that the assigned cross-claims should be treated as breach of implied warranty claims and not indemnity actions.

### *Is There Another Basis For Applying The Judgment Rule*

In concluding that actions of this kind should be treated as breach of warranty claims seeking consequential damages, Anderson cited comment *c.* to § 351 of the *Restatement (Second) of Contracts.* Section 351 provides generally that, in a breach of contract action, damages are not recoverable for a loss that the party in breach did not have reason to foresee as a probable result of the breach, but it declares a loss foreseeable if it follows from the breach in the ordinary course of events or as a result of special circumstances that the breaching party had reason to know.

Comment *c.* to that section notes that a breach of contract sometimes results in claims by third persons against the injured party, and, with respect to that situation, makes two points which, in the context of the issue now before us, may seem facially ambiguous but can easily be harmonized. The comment, captioned *"Litigation or settlement caused by breach,"* opines first that "[t]he party in breach is liable for the *amount of any judgment* against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract." (Emphasis added). That would suggest application of the judgment rule, as urged by Pulte. The comment later notes that "[i]n furtherance of the policy favoring private settlement of disputes, the injured party is also allowed to recover *the reasonable amount of any settlement made* to avoid the litigation, together with the costs of settlement." (Emphasis added).

██ As we have observed, in a contractual indemnity situation, the issue of whether the indemnification covers only the amounts paid by the indemnitee to a third party (plus associated expenses) or includes unpaid parts of judgments as well is governed by the scope of the indemnity: is the indemnity against only loss or damage or is it against liability? Where the indemnity is pursuant to an express contract, the contract will determine the answer. Where the indemnity is

implied in fact from an underlying contractual relationship, the same rule should apply—what was the nature of the indemnity that the parties anticipated? Where the indemnity is implied by law, however, and is therefore not governed by the parties' anticipation or expectation, considerations of underlying fairness and public policy become more relevant.

This Court first dealt with that situation in *Sweeten v. Nat'l Mutual,* 233 Md. 52, 194 A.2d 817 (1963), where, as the result of an automobile insurance company's unjustified refusal to settle a claim, a tort judgment was rendered against the insured in an amount exceeding the policy limit. In an action by the insured to recover the difference, it was conceded that the insured had not paid the excess amount and had insufficient assets from which to do so. The appeal arose from the sustaining of a demurrer in which the insurer argued that, because the excess amount had not been paid by the insured, there was no showing of damage. This Court reversed, noting that "the trend of all the recent decisions is towards the view that payment is not a prerequisite to recovery in this type of situation." *Id.* at 56, 194 A.2d at 819. We added that "the mere existence of an unsatisfied judgment may cause legal injury by loss or impairment of credit, and inability to obtain or retain an automobile operator's license, except under certain statutory penalties or conditions." *Id.* at 57, 194 A.2d at 819.

In *Roebuck v. Steuart,* 76 Md.App. 298, 544 A.2d 808 (1988), the Court of Special Appeals, relying in part on *Sweeten,* applied the same principle in the context of a legal malpractice action. Due to the negligence of her lawyer, a judgment for over $60,000 was entered against the client, who sued to recover that amount. As in *Sweeten,* the lawyer defended on the ground that no part of the judgment had been paid, and, as we did in *Sweeten,* the intermediate appellate court rejected that defense, holding that, where a client suffers a judgment as a result of the lawyer's negligence, the judgment is the amount of loss.

In arriving at that conclusion, the court concurred with the views expressed in a dissenting opinion in *Allied Productions, Inc. v. Duesterdick*, 217 Va. 763, 232 S.E.2d 774, 776–77 (1977). Justice Poff there noted the anomaly of the contrary view— that if the client had no cause of action until the judgment had been paid, the larger the judgment, the greater both the client's burden and the lawyer's impunity: "The [contrary] rule would seem to penalize a lawyer for his negligence when it costs his client a modest judgment but grant him immunity when his negligence results in a judgment too large for the client to pay." *Id.* at 777. Poff made the further observation:

> "Finally, the rule the majority adopt will force the client to choose whether to postpone suit against his negligent lawyer until he has paid his judgment-creditor in full or to institute a separate suit against his lawyer for each partial payment he makes. How the latter course might be affected by the doctrine of *res judicata* one can only wonder."

*Id.* An "equally vexatious" problem noted by the Court of Special Appeals if the prepayment rule were adopted was the question of when the statute of limitations would begin to run. *Roebuck*, 76 Md.App. at 310, 544 A.2d at 814.

Application of the judgment rule in those kinds of cases, founded on an indemnity implied by law and based on principles of fairness and equity, is fully justified, for the reasons noted. The judgments in those cases, for which indemnity or reimbursement was sought, were the product of an adversarial adjudicatory process in which a court determined both liability and the measure of damages, and those judgments were legally enforceable against the judgment debtors, whether or not the debtors were, in fact, able to discharge them. In those situations, it would, indeed, be grossly unfair and inconsistent with public policy to limit recovery only to the amount the debtor was able to pay on the judgment.

That rule, we think, should be equally applicable to actions to recover consequential damages for breach of warranty under CL §§ 2–714(3) and 2–715, for the equities are the same. If a buyer suffers an adjudicated and enforce-

able liability to a third party because of defective goods the buyer has purchased from a seller who has expressly or impliedly warranted against the defect, the buyer should not be limited, in an action against the seller for breach of the warranty, to only the amount the buyer has paid on the judgment. We agree as well with the *Restatement* view that, if the buyer enters into a good faith settlement with the third party in order to avoid the commencement or continuation of litigation, the buyer should be able to recover the cost of the settlement from the breaching seller, and we would apply that rule even if the settlement amount is allowed to be paid over time, rather than in a lump sum, so long as the liability is legally enforceable against the buyer.

This case falls into neither of those categories. The judgments entered against Coronado, CSS, and American EIFS were not the product any adjudication by a court, but were consent judgments arrived at without any judicial oversight or *imprimatur*. Although that alone, in an appropriate case, might not preclude application of the judgment rule, the fact that Pulte expressly agreed never to enforce those judgments beyond the $725,000 actually paid on behalf of the three defendants made the judgments little more than a collusive sham.

Whether or not the amount of the judgments had any relationship to the damages actually suffered by Pulte is irrelevant. Because Pulte agreed that the enforceable liability of those defendants was limited to the $725,000, which was paid even before the judgments were entered, none of them will ever be in danger of having to pay more than that amount. The $725,000 thus constitutes both the loss and the liability. To permit those defendants, as cross-claimants, to recover in excess of $5 million from Parex when their total exposure from the breach of implied warranty, in the aggregate, was limited to and could never exceed $725,000, would be to allow an unconscionable windfall, to which neither they, nor Pulte as their assignee, are entitled.

Despite Pulte's protestations, we see no unfairness in this result. All of Pulte's direct claims against Parex were dismissed, for reasons no longer challenged. All that it had left were its claims against Coronado, CSS, and American EIFS, and it freely chose to settle with those defendants for $725,000. That established their loss and liability and thus capped the value of their cross-claims. We thus construe the language in Comment *c.* to § 351 of the *Restatement* to permit recovery of the full amount of a judgment only when the judgment was either the product of an adversarial adjudication or a bona fide settlement *and* is legally enforceable against the judgment debtor, but to treat what occurred here as nothing more than a $725,000 settlement.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.